# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEPHEN D STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-03645-TWP-TAB |
| | ) | |
| CITY OF MUNCIE, and DENNIS TYLER, | ) | |
| Mayor, in his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

This matter is before the Court on Defendants City of Muncie's ("Muncie") and Dennis Tyler's ("Mayor Tyler") (collectively, the "Defendants") Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) (Filing No. 13). After resigning his position as Chief of Police for the city of Muncie, Indiana, Plaintiff Stephen D. Stewart ("Stewart") filed this action under Title 42 U.S.C. § 1983, asserting claims that the City of Muncie and its mayor violated his right to due process, breached the collective bargaining agreement between Muncie and the police union, violated Indiana's Wage Payment Statute, and constructively discharged him. He seeks compensatory and punitive damages, as well as unpaid wages. Defendants filed a Motion, asserting among other things that Stewart failed to plead certain elements of his § 1983 claim and that the breach of contract claims should be resolved in an arbitration proceeding. For reasons explained below, Defendants' Motion is **granted in part and denied in part**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion for judgment on the pleadings, the Court accepts as true all factual allegations in the

complaint and draws all inferences in favor of Stewart as the non-moving party. *See Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 464 (7th Cir. 2012).

Stewart began working for the Muncie Police Department in 1985. (Filing No. 1 at 2.) He held numerous positions in the Police Department, and in 2012 Mayor Tyler appointed him Chief of Police. *Id.* The highest rank he had held prior to being appointed Chief was Sergeant. *Id.* In addition to becoming Chief of Police, in 2013 Stewart began serving as the Chairman of the local Democrat Central Committee at the request of Mayor Tyler and others. *Id.*

In late 2015 or early 2016, Defendants learned that a long-time Muncie city employee might be cooperating with the Federal Bureau of Investigations ("FBI") in its investigation of corruption within the City of Muncie. *Id.* at 3-4. Shortly after the employee was terminated in February or early March 2016, Mayor Tyler told Stewart that he thought the employee had committed crimes. *Id.* at 4. He did not identify any specific crimes. *Id.*

Stewart told Mayor Tyler that if he had any evidence of the employee committing crimes, Mayor Tyler needed to bring it to him. *Id.* Mayor Tyler then told Stewart over the telephone that the former employee's computer contained evidence of criminal activity. *Id.* Stewart instructed the Deputy Chief of Police to impound the computer and place it in the property room. *Id.* Shortly thereafter, Sarah Beach ("Beach"), a member of Mayor Tyler's staff, came to Stewart's office with a large stack of emails obtained from the former employee's computer. *Id.* Beach told Stewart the emails contained evidence of possible crimes but did not identify what crimes specifically. *Id.* Stewart told Beach he would look into the emails. *Id.*

Stewart was concerned regarding the ethics of Mayor Tyler's request to investigate the former employee based on unsubstantiated accusations. After speaking with another law enforcement official, Stewart decided it would be unethical and inappropriate to investigate the

former employee merely because that employee may be a cooperating witness in an FBI investigation. *Id.* at 5. Stewart received a telephone call from an FBI agent requesting the emails the Mayor's office had given him. *Id.* He turned over those emails to the FBI and informed the agent that the former employee's computer had been secured and placed in the police department's property room. *Id.* Stewart then notified Mayor Tyler that he had turned over the emails to the FBI. *Id.*

Mayor Tyler immediately asked when the FBI was going to retrieve the computer from the evidence room. *Id.* Additionally, Stewart learned that a Muncie police officer had been instructed to make an exact copy of the computer's hard drive so that the city of Muncie and its employees would still have access to the information on it after the FBI confiscated it. *Id.*

In the late spring or early summer of 2016, Mayor Tyler requested that Stewart attend a meeting with him and two other police officers. *Id.* During that meeting, Mayor Tyler explained to Stewart that he thought it necessary that the police department investigate the former employee because the employee was cooperating with the FBI and the FBI would not disclose anything about the investigation to the city of Muncie. *Id.* at 6. Mayor Tyler requested Stewart carry out the investigation. *Id.* Stewart was again uncomfortable due to the ethical implications of the Mayor's request. Stewart arranged a meeting with the FBI agent who had come to collect the former employee's emails. At that meeting, which occurred approximately a week after his meeting with Mayor Tyler, Stewart asked the FBI agent if the FBI would like any assistance at all, to which the FBI agent replied, "Thanks for the offer, but no thanks." *Id.*

Throughout the summer of 2016, Mayor Tyler continued to pressure Stewart to investigate the former employee. *Id.* Stewart understood from this pressure that refusal was grounds for his termination or removal as Chief of Police. *Id.* Each time the subject came up, Stewart informed

Mayor Tyler that he was not going to investigate the former employee because any investigation would interfere with the ongoing FBI investigation. *Id.* Mayor Tyler also asked Stewart to conduct investigations of other employees with the sole purpose of getting to the former employee without directly investigating the former employee. *Id.* at 6-7.

In early September 2016, Stewart met with the Mayor and another man named Phil Nichols ("Nichols")—whose occupation the complaint does not disclose—at the Democrat Central Committee headquarters. *Id.* at 7. At that meeting, Nichols yelled and screamed at Stewart, telling him that Stewart would conduct the investigation of the former employee as requested. *Id.* Later that day, Stewart attended another meeting at which Nichols, attorneys, and two other Muncie police officers were present. *Id.* Nichols asked Stewart if he was going to conduct the requested investigation or not. *Id.* Stewart reiterated that he would not conduct the investigation and the reasons for his refusal. *Id.* Nichols told him there would be another meeting in the morning and Stewart would not like the outcome of that meeting. *Id.*

On September 2, 2016, Stewart resigned as Chairman of the local Democrat Central Committee. *Id.* Following his resignation from that position, Mayor Tyler requested another meeting with him, during which he again asked Stewart to investigate the former city employee. *Id.* In mid-September, Stewart and the local prosecutor met with Mayor Tyler and explained to him why the police department would not investigate the former employee. *Id.* at 8. Over the next seven weeks, Mayor Tyler continued to periodically request that Stewart conduct an investigation, and Stewart refused each time. *Id.*

On October 30, 2016, Stewart discovered that Mayor Tyler had asked someone to make false allegations against him. *Id.* Stewart resigned as Chief of Police the following day, at which point he returned to his status of merit officer with the rank of Sergeant. *Id.* Upon receiving

Stewart's letter of resignation, Mayor Tyler called Stewart to a meeting in his office. *Id.* At the meeting, which Stewart's personal attorney attended, Stewart broached the issue of Mayor Tyler asking an individual to make false allegations about him. *Id.* Mayor Tyler told Stewart he did not like the proposed letter of resignation and that Stewart would "pay for this." *Id.* at 9. Stewart submitted his letter of retirement from the Muncie Police Department on November 1, 2016. *Id.*

Shortly after his resignation, the Administrative Assistant to the Chief of Police completed Stewart's final Personnel Information Form. *Id.* According to the Administrative Assistant's records, under the collective bargaining agreement between the Fraternal Order of Police ("FOP") and Muncie, Stewart was to be paid out for a total of five hundred and twenty (520) days as follows: forty-five (45) severance days, two hundred and thirty (230) sick days, and two hundred and forty-five (245) vacation days. *Id.* Stewart's benefits would have started on Nov. 1, 2016 and ended on Oct. 26, 2018, according to the Administrative Assistant. *Id.* On November 22, 2016, Stewart submitted an Application for Participation in the State of Indiana's Deferred Retirement Option Plan ("DROP"). *Id.*

After the Administrative Assistant completed his Personnel Information Form and he made his DROP elections, Stewart was informed that Beach would recalculate his benefits. *Id.* at 10. Beach determined that Stewart should be paid for a total of two hundred and seventeen (217) days: thirty (30) severance days, one hundred and seventy-two (172) sick days, and fifteen (15) vacation days. *Id.* This would result in his benefits ending on August 30, 2017, rather than October 26, 2018. The recalculation resulted in a financial loss to Stewart of over $65,802.51 for 303 days of paid time he was denied, $65,000.00 for the longer DROP period he was denied, and $34,000.00 for the DROP program he would be ineligible for. *Id.* Stewart challenged this recalculation, but his grievances were denied. *Id.* at 11.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the parties have filed a complaint and an answer. Rule 12(c) motions are analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007); *Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir. 1996). The complaint must allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.* Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (internal citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Like a Rule 12(b)(6) motion, the Court will grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (*quoting Craigs, Inc. v. Gen. Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). The factual allegations in the complaint are viewed in a light most favorable to the non-moving party; however, the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Id.* (*quoting R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)). "As the title of the rule implies, Rule 12(c) permits a judgment based on the pleadings alone. . . . The pleadings include the complaint, the answer, and any written instruments attached as exhibits." *Id.* (internal citations omitted).

### III.  DISCUSSION

Stewart brings six claims against Defendants: (1) a Fourteenth Amendment Due Process Violation under 42 U.S.C. § 1983, and state law claims for (2) breach of contract, (3) breach of contract – third party beneficiary, (4) promissory estoppel, (5) violation of Indiana's Wage Payment Statute, Ind. Code § 22-2-5-1, and (6) constructive discharge.  (Filing No. 1.)

**A.     Count 1 – Fourteenth Amendment Due Process Violation**

Stewart alleges Defendants violated his Fourteenth Amendment right to due process by disseminating false and defamatory statements about him after he resigned from the police force.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) that he had a cognizable liberty interest under the Fourteenth Amendment; (2) that he was deprived of that liberty interest; and (3) that the deprivation was without due process. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).  In analyzing due process claims, the court's inquiry involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005).

Citing to paragraph 63 and paragraphs 86-88 of his Complaint, Stewart identifies a liberty interest the Defendants have interfered with:  they made false public claims to the media that Stewart committed crimes of dishonesty and moral turpitude that will damage his standing and associations in the community and impose a stigma that interferes with his ability to obtain other employment in the field of law enforcement.  (Filing No. 20 at 3.)  Stewart alleges he was denied procedural due process because Defendants did not abide by the grievance procedure outlined in the operative collective bargaining agreement between Muncie and the police union. (Filing No. 20 at 5.)

Defendants argue Stewart has failed to allege an actionable § 1983 claim because he did not plead a protected liberty interest, did not plead publication of the Defendants' supposed false claims, did not adequately plead the claims were false, and failed to plead a deprivation of constitutionally sufficient procedures. (Filing No. 14 at 7-14.)

1.  **Protected Liberty Interest**

Mere defamation by the government does not deprive a person of a liberty interest protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment. *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 730 (7th Cir. 2006) (quoting *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002)). However,

> when a state fires an employee for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of dishonesty or other job-related moral turpitude, the consequences are so nearly those of formally excluding him from his occupation that the law treats the state's action the same way, and insists that due process be provided.

*Lawson v. Sheriff of Tippecanoe Cnty., Ind.*, 725 F.2d 1136, 1139 (7th Cir. 1984). The United States Supreme Court has created a realm of § 1983 claims termed "stigma-plus"—the stigma accompanying defamatory remarks alone is insufficient to give rise to a claim under § 1983; rather, the plaintiff "must allege more than just defamation or stigmatic-harm, he must also state a 'plus': He must allege that the defendants' defamatory statements 'alter or extinguish a right or status previously recognized by state law.'" *Santana v. Cook Cnty. Bd. Of Review*, 679 F.3d 614, 621 (7th Cir. 2012) (quoting *Brown*, 462 F.3d at 730).

Stewart alleges the Defendants accused him of crimes of dishonesty and moral turpitude that would stigmatize him in the law enforcement community. (Filing No. 1 at 11-12; Filing No. 20 at 3.) He does not allege the "plus" factor required for a valid § 1983 claim. That "plus" factor sometimes comes when a plaintiff is terminated from his job because the state has made

defamatory remarks about him. *E.g., Codd v. Velger*, 429 U.S. 624 (1977). Stewart does not allege that Defendants' defamatory remarks caused him to lose his job, rather, he admits that he was not discharged from his position at all. He chose to resign from his position as Chief of Police and then retire from the police force entirely. (Filing No. 1 at 8-9.) The fact that he was not terminated puts Stewart on even footing with the plaintiffs in *Hinkle v. White*, 793 F.3d 764 (7th Cir. 2015) and *Fritz v. Evers*, --- F.3d --- (7th Cir. 2018) (2018 WL 5262736), two recent cases in which the Seventh Circuit held that the plaintiff had not stated a claim under § 1983 because he had not passed the "stigma-plus test."

Although it comes elsewhere in his Complaint, Stewart alleges the Defendants constructively discharged him by continuously asking him to conduct an investigation that would constitute criminal interference with an FBI investigation. (Filing No. 1 at 14-15.) A constructive discharge might qualify as an alteration of Stewart's legal status, satisfying the stigma-plus test. The Third Circuit, the only circuit to address that question, has held that constructive discharge can be sufficient to satisfy the "plus" component of the stigma-plus test. *Hill v. Borough of Kutztown*, 455 F.3d 225, 238 (3d Cir. 2006). "Constructive discharge occurs when an employee resigns because working conditions are so intolerable that a reasonable employee would feel compelled to quit." *Lifton v. Bd. Of Educ. Of City of Chicago*, 416 F.3d 571, 578 (7th Cir. 2005) (citing *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000)). "The doctrine of constructive discharge is limited to egregious cases, such as, for example, where an employee is subjected to threats or repeated racist taunting." *Id.*

Stewart's pleadings support his contention that he was constructively discharged for purposes of his § 1983 claim. Stewart alleges that throughout the spring and summer of 2016 Mayor Tyler pressured him to investigate a former city employee who was cooperating with an

FBI investigation of Muncie.  According to his Complaint, Stewart had an "implicit understanding that to do otherwise was grounds for removal and/or termination."  (Filing No. 1 at 6.)  Later, Stewart and two other officers left a meeting with Mayor Tyler "thinking Plaintiff Stewart was going to be fired as Police Chief."  *Id.* at 7.  The Complaint lays out the longevity and the temerity of Mayor Tyler's campaign to coerce him into investigating the former Muncie employee, including a meeting where Mayor Tyler was present during which Stewart was "yelled and screamed at" to "conduct the investigation as requested."  *Id.*  Stewart's assumptions that he would be terminated if he did not conduct the investigation are conjecture, and thus not entitled to a presumption of truth at this stage.[1]  But Stewart's claim for constructive discharge does not rest merely upon his assumption that he would be terminated.  The Complaint describes a work environment in which Stewart was constantly directed by his immediate superior to conduct an investigation he believed was illegal.  When he raised his ethical concerns to Mayor Tyler, the requests for him to conduct the investigation only increased until the point where he was being screamed at in a meeting with Mayor Tyler present.  It is possible that such circumstances would have induced a reasonable person in Stewart's position to quit.  Thus, the Complaint includes sufficient factual allegations to support a claim that Stewart was constructively discharged and this element of his § 1983 claim survives judgment on the pleadings.

## 2.    Deprivation of a Liberty Interest

The next element Stewart must plead to establish his § 1983 claim is that the government deprived him of his protected liberty interest.  Defendants' assert two arguments concerning this element: (1) that Stewart failed to plead the Defendants published their allegedly defamatory

---

[1] *See Roake v. Forest Pres. Dist. Of Cook Cnty.*, 849 F.3d 342, 347 n.4 (7th Cir. 2017) ("Roake's conclusory and hypothetical assertion that he 'would have been terminated' had he not resigned is pure conjecture; it is not a well-pleaded factual allegation entitled to a presumption of truth on a motion to dismiss.")

statements, and (2) that Stewart failed to plead the Defendants' allegedly defamatory statements were false.  (Filing No. 14 at 12-13.)  These arguments center on the specificity, or lack thereof, in the Complaint. According to Defendants, "Stewart merely asserts that the Defendants created false and defamatory impressions about the reasons for Stewarts [sic] resignation 'to the local media and others,' without identifying such impressions or stating how they were disseminated." *Id.* at 13 (quoting Stewart's Complaint). And "Stewart's Complaint insufficiently pleads falsity by simply referring to 'false and defamatory impressions' and accusations, without specifically identifying the alleged defamatory impressions/accusations and alleging the untruth of such identified content."  *Id.*

Stewart responds that the Complaint is sufficiently specific to state a § 1983 claim.  The Complaint alleges that near the time of his retirement, Defendants gave local media the false impression that Stewart committed insubordination, fraud, and sexual harassment, and these were the reasons he resigned as Chief of Police.  (Filing No. 1 at 11-12.)  The Court agrees.  The Complaint sufficiently pleads facts stating the Defendants deprived Stewart of his protected liberty interest.  Stewart alleges that, before he resigned as Chief of Police, Mayor Tyler "had gone to an individual, requesting that the individual make false allegations against Plaintiff Stewart." *Id.* at 8, ¶ 63. He also alleges that Defendants created false and defamatory impressions about the reasons for his resignation to local media and others, and that Mayor Tyler attempted to recruit other employees to make false accusations about Stewart.  *Id.* at 11, ¶ 87-88.  The allegation that Defendants created a false impression to the media is not merely a restatement of the legal standard, because allegations about Mayor Tyler recruiting city employees to smear Stewart are specifically pled, and thus the Court cannot grant Defendants' Motion on that basis.

### 3. **Deprivation without Due Process**

Finally, to survive judgment on the pleadings, the Complaint must allege that Defendants deprived Stewart of his liberty interest without due process. Defendants argue the Complaint "fails to allege any constitutionally insufficient procedures related to the defamatory statements," and because The Complaint did not specifically say what defamatory statements were made about him, "it remains unclear what procedure the City could have provided him." (Filing No. 14 at 14.)

"The basic rights guaranteed by constitutional due process are notice of the intended adverse government action and an opportunity to be heard in response, although more elaborate procedural rights—such as the rights to present evidence, to confront adverse witnesses, and to be represented by counsel—may apply in cases in which vital private interests are at risk." *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017) (citing *Golberg v. Kelly*, 392 U.S. 254 (1970)). Stewart's only mention of the process he received laments the way the Defendants treated him, saying "Plaintiff Stewart attempted to grieve [the recalculation of his retirement benefits] pursuant to the 2016 Agreement and/or the 2013 Agreement. His grievance was denied at each level, including being denied the right to a face-to-face meeting with Defendant Tyler." (Filing No. 1 at 11, ¶ 82.) In his response to Defendants' Motion, Stewart asserts he had no opportunity to grieve his constructive discharge and the Defendants' defamatory statements because Defendants made those statements after he retired, when he was no longer employed by Muncie. (Filing No. 20 at 5.) He also argues alleging the denial of the grievance procedure required by the collective bargaining agreement is sufficient to establish that he was denied procedural due process. *Id.*

Stewart admits that although the Complaint could have been clearer, it does specifically state that Defendants rebuffed his requests to grieve the actions alleged in the Complaint. More

importantly, the Complaint alleges he was denied a face-to-face meeting with Mayor Tyler, as guaranteed by the collective bargaining agreements ("CBA"). This allegation implicates a fundamental aspect of procedural due process—the right to a hearing. The Court cannot say that Stewart would be unable to prove his § 1983 claim at trial. Accordingly, Defendants' Motion for Judgement on the Pleadings is **denied** as to Count 1.

**B.**     **Counts 2 and 3 – Breach of Contract and Breach of Contract – Third Party Beneficiary**

The contract referred to in these counts is the collective bargaining agreement between the Muncie and the Fraternal Order of Police Lodge #87, which governed Stewart's payout upon his retirement. Two versions of that agreement are at issue here, the CBA in effect between January 1, 2013-December 31, 2015 ("2013 CBA") (Filing No. 1-1), and the CBA in effect between January 1, 2016-December 31, 2016 ("2016 CBA") (Filing No. 1-2).

Stewart asserts that the 2016 CBA was in effect when he retired and governs his benefits and severance. Mayor Tyler signed the 2016 CBA is his capacity as Mayor of Muncie and Stewart signed it in his capacity as Chief of Police. Other city officials and FOP higher-ups signed the agreement as well. Article 46 of the 2016 CBA states:

This article is retroactive to January 1, 2012.

The Chief of Police is entitled to all benefits granted in this contract during their term. When the term ends for the Chief of Police and he/she is still receiving compensation from the Muncie Police Department he/she shall receive rank pay equivalent to that of a Captain or the highest merit rank pay, whichever is greatest.

Defendants contend that the 2016 CBA was never ratified in accordance with its own internal mandate and thus "holds no legal effect." (Filing No. 14 at 18.) Therefore, under the Defendants' theory of the case, the 2013 CBA "continued in effect until a new CBA has been agreed to by the FOP and Muncie and the same obtains passage and adoption by the Muncie City

Council," which, according to Defendants, occurred on January 1, 2017. *Id.* at 3 (citing 2013 CBA, Art. 49 and Muncie Ordinance 41-93, section 5(B)).

Additionally, Defendants argue that either the 2013 CBA or the 2016 CBA, whichever was in effect at the time of Stewart's retirement, requires arbitration. *Id.* at 14. Because the CBA mandates arbitration, Defendants argue this Court lacks subject matter jurisdiction over counts 2 and 3 under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq. Id.*

Both CBAs contain the same language regarding when a grievance is subject to arbitration. In the Article titled "Grievance Procedure," after listing the first two steps of the Police Department's grievance procedure, each CBA states:

> Step 3: If the grievance is not settled in Step 2, the grievance may be presented at Step 3. The grievance shall be presented by the aggrieved and/or the F.O.P. grievance committee in Step 2. Step 3 shall be heard by the Mayor or his designee. The Mayor shall arrange for a meeting to receive and hear information concerning the grievance and the meeting shall occur within 15 working days after receipt of the written grievance by the office of the Mayor. The aggrieved member, representatives of the grievance committee, the Chief of Police and any other persons allowed by the Mayor shall be entitled to attend said meeting. The meeting will be informal and parties shall endeavor to settle their differences. The Mayor's final determination shall be rendered in writing within 10 working days after the meeting date. Copies shall be sent to the Mayor, the Chief of Police, and the aggrieved member and the F.O.P. representative. All time limits specified in this Article 10 may be extended solely by written agreement of the Chief of Police and the F.O.P.

> Step 4: If the grievance is not settled in Step 3, the aggrieved member and/or the F.O.P. grievance committee may appeal the grievance by submitting the grievance to final and binding arbitration within 20 workdays after the City's Step 3 answer. Notwithstanding the preceding, all of the terms decided by the arbitrator requiring the expenditure of funds that have not been previously appropriated must be submitted to the City Council for ratification.

([Filing No. 1-1 at 8](#), [Filing No. 1-2 at 9](#).) The next Article, identical in the two CBAs, contains the arbitration procedures, which include selection of the arbitrator, the arbitrator's power, how parties

will resolve disputes over arbitrability, and which party bears the cost of arbitration. (Filing No. 1-1 at 8-9, Filing No. 1-2 at 9-10.)

The Seventh Circuit has said that "both the law and public policy strongly favor arbitration." *International Bhd. Of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir .2014). The party seeking arbitration is entitled to the benefit of the doubt, and where the arbitration clause is broad, the court will presume arbitrability of disputes. *Id.* Where any ambiguity as to the scope of the clause exists, the court will construe it in favor of the party seeking arbitration. *Id.* The court will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Intern. Union v. TriMas Corp.*, 531, 535 (7th Cir. 2008) (internal quotations omitted).

Stewart contends the language of the CBAs does not require arbitration for two reasons: (1) the language is permissive, allowing the aggrieved employee to pursue arbitration if he is unsatisfied with the grievance procedure but not requiring he take that route, and (2) Stewart, as Chief of Police, was not an "employee" under the agreement at the time of the events detailed in the Complaint, and thus the arbitration agreement would not apply to him anyway. (Filing No. 20 at 6-9.)

Stewart is correct that the arbitration clause in dispute here is not broad. The provision allows the aggrieved employee to appeal an adverse decision from the Mayor by submitting the grievance to arbitration, but it does not appear to require the aggrieved employee to settle his grievance that way. In contrast with other arbitration clauses examined recently in this Court, the CBAs here do not call arbitration the exclusive venue for final resolution of grievances, nor do they say that all disputes arising out of the agreement must be settled in arbitration. *E.g.*

*Akinlemibola v. Dohardmoney.com*, No. 1:17-cv-03998-TWP-DML, 2018 WL 4491209 (S.D. Ind. 2018) (finding arbitration required where a contract stated "All disputes, controversies or claims arising from or relating to this agreement shall be submitted to binding arbitration…."); *Leslie v. Hooters of America, LLC*, No. 1:17-cv-02873-SEB-MJD, 2017 WL 6620884 (S.D. Ind. 2017) (requiring arbitration where an arbitration agreement covered "any and all disputes…which relate in any manner whatsoever as to [sic] [Plaintiff's] employment, including but not limited to…claims or charges based upon…[the ADEA]. [Title VII], and any other civil rights statute[.]") (brackets original). Stewart argues that because of its permissive language, the "Grievance Procedure" Article of the CBAs is not an arbitration agreement at all; it is merely an invitation for aggrieved employees to submit unresolved grievances to an arbitrator and an agreed-upon set of rules they must follow should they choose to do so.

That reading of the clause is appealing and would likely be enough to survive a motion for judgment if not for the law's strong presumption in favor of arbitration. When assessing an arbitration clause, the Court may follow general principles of contract interpretation "only to the extent that they comport with the federal policy in favor of arbitration. *United Steel*, 531 F.3d at 536. The arbitration clause at issue here has two reasonable interpretations. The first, taken by Stewart, is that the clause merely allows an aggrieved employee to submit a grievance to arbitration as one among several ways of attempting to resolve that grievance. The second, taken by Defendants, is that the clause explains the exclusive final procedure available to an aggrieved employee should he wish to appeal the Mayor's decision. Although Stewart's interpretation may well be what the parties wanted when they signed the CBAs, the Court cannot say with positive assurance that the arbitration clause is not susceptible of Defendants' interpretation.

Second, Stewart argues he is not an employee under the CBAs, and thus the arbitration clause does not apply to him. Article 1, Section 1.02 of both CBAs says the following:

> Section 1.02. Bargaining Unit. The bargaining unit shall consist of all regular and retired police officers of the Police Department of the City of Muncie, but excluding the Police Chief, Deputy Chiefs, Reserve Police Officers, Auxiliary Police Officers and civilian personnel.
>
> The term "employee", "employees", and "regular police officer" in this agreement mean only those employees of the City who are in the bargaining unit defined above.

([Filing No. 1-1 at 2](#), [Filing No. 1-2 at 3](#).) The two agreements differ with respect to what a "member" is. Under the 2013 CBA, "The term 'member' and 'members' is defined as any member of the FOP Lodge #87." ([Filing No. 1-1 at 2](#).) Under the 2016 CBA, "The term 'member' and 'members' is defined as any full time police officer of the Muncie Police Department who is also a member of the FOP Lodge #87." ([Filing No. 1-2 at 3](#).) This distinction is irrelevant for the purposes of this case because Stewart was both a full-time officer and a member of the FOP Lodge #87 at all relevant times. Stewart argues that because the Police Chief is not a member of the "bargaining unit," he is not an employee under the CBAs and thus the arbitration clause does not cover his dispute with Muncie and Mayor Tyler. It is clear that Stewart, as Chief of Police, was not an "employee" under either CBA but is a "member" under both CBAs.

The Grievance Procedure Articles in both CBAs are imprecise with their use of the terms "employee" and "member". The Articles start by purporting to ensure "employees" a fair working environment, but when describing the actual grievance procedure, refer to the "aggrieved member." ([Filing No. 1-1 at 7-8](#), [Filing No. 1-2 at 8-9](#).)[2] But the crucial sentence reads: "If the

---

[2] For example, the Articles begin, "The City and the F.O.P. agree that employees covered by this agreement shall be treated fairly, uniformly, and with dignity. The grievance procedure is a formal mechanism intended to assure that employee grievances that may develop in the day-to-day activities of public service are promptly heard, answered, and action taken where appropriate." Later, when describing how to submit a grievance, the Articles say, "Step 1: The

grievance is not settled in Step 3, the aggrieved member and/or the F.O.P. grievance committee may appeal the grievance by submitting the grievance to final and binding arbitration within 20 workdays after the City's Step 3 answer." (Filing No. 1-1 at 8, Filing No. 1-2 at 9.) Because the sentence introducing the opportunity to arbitrate refers to an "aggrieved member" and not an employee, the Court cannot say with confidence that it was meant to exclude the Chief of Police. Thus, Stewart's complaints arising out of either the 2013 or the 2016 fall under the arbitration clause in those agreements.

Defendants' contend the arbitration clause deprives this Court of subject matter jurisdiction to hear Plaintiff's breach of contract claims, and thus the Court should dismiss those counts. (Filing No. 14 at 17. This Court and the Seventh Circuit have viewed motions to dismiss based on an arbitration clause as "an objection to venue, and hence properly raised under Rule 12(b)(3)." *Akinlemibola v. Dohardmoney.com*, 2018 WL 4491209 at *2 (S.D. Ind. 2018) (quoting *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801 at 807 (7th Cir. 2011)).

The Court **grants** Defendants' Motion with regards to counts 2 and 3 and **dismisses** those counts **without prejudice**. Dismissal for improper venue is without prejudice because it is not an adjudication on the merits. Fed. R. Civ. P. 41(b); *see also In re IFC Credit Corp.*, 663 F.3d 315, 320 (7th Cir. 2011). Stewart may decide whether to pursue these two claims through arbitration.

## C.    Count 4 – Promissory Estoppel

Stewart asserts the 2016 CBA governs his payout upon retirement and entitles him "to all benefits granted in this contract during [his] term" as Chief of Police. (Filing No. 1-1 at 38.) Defendants contend the 2013 CBA, which contains no such provision guaranteeing the Chief of

---

aggrieved member shall submit details of the grievance in written form to any member of the F.O.P. grievance committee within 10 working days after the aggrieved member becomes aware or should have become aware of the occurrence of the event or circumstance giving rise to the grievance."

Police certain benefits when his term ends, controls because the Muncie City Council never ratified the 2016 CBA. ([Filing No. 14 at 18](#).) Stewart argues that even if the 2016 had no legal effect because the Muncie City Council failed to ratify it, he is entitled to recover the amount owed according to the 2016 CBA under the doctrine of promissory estoppel.

Under Indiana law, a party asserting promissory estoppel must establish five elements: (1) a promise by the promisor (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise. *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 581 (Ind. 2007). Although "[e]stoppel is not generally applicable against government entities for the actions of public officials," it may be appropriate "where the party asserting estoppel has detrimentally relied on [a] governmental entity's affirmative assertion or on its silence where there was a duty to speak. *Id.*

Defendants argue that because the Muncie City Council never ratified the agreement, it "fails to stand as a valid and enforceable contract," and thus "cannot be the basis for a promissory estoppel claim." ([Filing No. 14 at 18-19](#).) But a promise need not be a valid and enforceable contract in order to serve as the basis of a promissory estoppel claim. *See, e.g., Yoost v. Zalcverg*, 925 N.E.2d 763, 769 (Ind. Ct. App. 2010) ("An oral promise not enforceable under the Statute of Frauds may nonetheless be enforced under the equitable doctrine of promissory estoppel."). It makes logical sense that promissory estoppel offers an equitable remedy in the absence of a contract because, were the contract valid and enforceable, the promisee would have a legal remedy available via a breach of contract action and would not need to bring an action for promissory estoppel.

At this early stage of litigation, Stewart has met the threshold for pleading a promissory estoppel action. He has identified a promise. (Filing No. 1 at 13, ¶ 104 ("The 2016 Agreement is a promise by the Defendants to pay certain wages and provide specific benefits to Plaintiff Stewart as Chief of Police and as a merit officer").) He alleges that promise induced his reliance. *Id.* at ¶106 ("Plaintiff Stewart relied upon the wages and benefits contained in the 2016 Agreement."). And he claims that as a result he suffered injustice that can be avoided by enforcing the promise. *Id.* at ¶108 ("Only then did Defendants claim the 2016 Agreement was somehow unenforceable and denied Plaintiff Stewart wages and benefits to which he is otherwise entitled.").

Although the bar a plaintiff must clear proving promissory estoppel against a government entity is high, the Court cannot find, based purely on the pleadings before it, that Stewart will not be able to clear that bar. Thus, Defendants' Motion for Judgment on the Pleadings is **denied** as to Count 4.

### D.      Count 5 – Violation of Indiana's Wage Payment Statute

The Complaint alleges Defendants' conduct violated Indiana's Wage Payment Statute, Ind. Code § 22-2-5-1. The Wage Payment Statute requires employers to pay an employee who voluntarily leaves employment any amount due to him at "the next usual and regular day for payment of wages" or before. Stewart alleges Muncie failed to pay his wages upon his retirement.

Defendants move for judgment on the pleadings, arguing that Stewart did not leave his employment voluntarily because he was constructively discharged. (Filing No. 14 at 19 (citing Filing No. 1 at 15, ¶124-125).) According to Defendants, Stewart must proceed under the Indiana Wage Claim Statute, which governs employees who were discharged. Ind. Code § 22-2-9-2. The Wage Claim Statute requires an aggrieved former employee to file an administrative claim with

the Indiana Department of Labor before he can bring a private action to recover alleged unpaid wages, which Stewart did not do.

Stewart's assertion that he was constructively discharged is a separate legal claim, not a statement of fact. The Federal Rules allow Stewart to plead legally inconsistent theories. Fed. R. Civ. P. 8(e). Were this matter before the Court on a motion for summary judgment, the Court would be in the position to determine which of two mutually exclusive legal claims should survive. But dismissal on a 12(c) motion is not warranted merely because the plaintiff states a legal conclusion inconsistent with this claim elsewhere is his complaint. Thus, Defendants' Motion is **denied** with regards to count 5.

### E. Count 6 – Constructive Discharge

The Complaint alleges Defendants constructively discharged Stewart in violation of Indiana law. That Indiana law, according to Stewart, arises out of the exception to the at-will employment doctrine for termination when an employee refuses to commit a criminal act, outlined in *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1996). (Filing No. 20 at 14.) Cases like *Tony v. Elkhart County*, 851 N.E.2d 1032 (Ind. Ct. App. 2006) and *Baker v. Tremco Inc.*, 917 N.E.2d 650 (7th Cir. 2009), have recognized that exception to the at-will employment doctrine can arise in constructive discharge scenarios as well.

Defendants move for judgment on the pleadings, arguing the Complaint fails to include facts supporting a conclusion that undertaking the investigation Mayor Tyler requested would have been a criminal act. (Filing No. 14 at 22.) In particular, Defendants argue Stewart cannot show that undertaking the investigation would have clearly violated Indiana's obstruction of justice statute, Ind. Code § 35-44.1-2-2. *Id.*

Under Indiana law, "A constructive discharge occurs when an employer purposefully creates working conditions [that] are so intolerable that an employee has no other option but to resign." *Tony*, 851 N.E.2d at 1037 (quoting *Cripe, Inc. v. Clark*, 834 N.E.2d 731, 735 (Ind. Ct. App. 2005)) (brackets in original). The constructive discharge doctrine transforms what is ostensibly a resignation into a firing. *Id.* In Indiana, under the public policy exception to the employment-at-will doctrine, a person may not be terminated for "refusing to commit an illegal act for which he would have been personally liable." *McClanahan*, 517 N.E.2d at 393, *see also Rodriguez v. Westside Ltd. Partnership*, 2008 WL 5247340 at *2 (S.D. Ind. 2008). This Court has held that Indiana's obstruction of justice statute qualifies as one for which a violator can incur personal criminal liability. *Rodriguez* at *3-4.

In their Motion, Defendants argue that "Stewart's mere belief that that [sic] the activity he was allegedly ordered to perform could be illegal is, without more, insufficient to support a *McClanahan* exception." (Filing No. 14 at 25.) But Stewart alleges specific facts in his complaint that explain why he had good reason to think investigating the former city employee would constitute illegal obstruction of justice. Stewart met with the FBI on multiple occasions and was told it would be inappropriate to investigate the employee and that the FBI did not need any assistance in its investigation. (Filing No. 1 at 5, ¶ 32 and 6, ¶ 45.) The local prosecutor also counseled against parallel investigations. (Filing No. 1 at 7-8, ¶ 59-60.) Additionally, Stewart was a long-serving police officer who no doubt had a good understanding of the interplay between law enforcement agencies and knew that investigating a witness in an FBI investigation would violate Ind. Code § 35-44.1-2-2. Accordingly, the Complaint is sufficient to state a claim for wrongful constructive discharge, and judgment on the pleadings is not warranted. Defendants' Motion is **denied** as to Count 6.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Judgment on the Pleadings (Filing No. 13).  Stewart's claims for breach of contract and breach of contract—third party beneficiary are **dismissed without prejudice**.  His other four claims: Fourteenth Amendment Due Process Violation under 42 U.S.C. § 1983, promissory estoppel, violation of Indiana's Wage Payment Statute, Ind. Code § 22-2-5-1, and constructive discharge **remain before this Court**.

**SO ORDERED.**

Date:  12/4/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brian M. Pierce
BRIAN M. PIERCE, ATTORNEY AT LAW
brianpiercelaw@aol.com

David J. Carr
ICE MILLER LLP (Indianapolis)
david.carr@icemiller.com

Kayla Ernst
ICE MILLER LLP (Indianapolis)
kayla.ernst@icemiller.com

Paul Conrad Sweeney
ICE MILLER LLP (Indianapolis)
paul.sweeney@icemiller.com